Filed 1/23/26  P. v. Chavers CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>BRENDAN JAMAR CHAVERS,<br><br>　　Defendant and Appellant. | D086607<br><br><br>(Super. Ct. No. FWV20001775) |


APPEAL from a judgment of the Superior Court of San Bernardino County, Daniel Detienne, Judge.  Reversed and remanded with directions.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Eric A. Swenson, Supervising Deputy Attorney General, Junichi P. Semitsu, Deputy Attorney General for Plaintiff and Respondent.

A jury convicted Brendan Jamar Chavers of robbery (Pen. Code, § 211). The trial court found true the allegation that Chavers inflicted great bodily injury in the commission of a felony (Pen. Code, § 12022.7, subd. (a)) and sentenced him to seven years in prison.

Chavers raises four issues on appeal. First, he asserts the judgment must be reversed because the trial court deprived him of his statutory rights under Code of Civil Procedure[1] section 231.7 when it denied his counsel's objection to the prosecutor's peremptory challenge of the only African-American[2] male prospective juror in the venire. We conclude the trial court erred by permitting the peremptory challenge, which requires reversal.

Next, Chavers seeks dismissal of the robbery count, arguing that as a matter of law the evidence was insufficient to satisfy the elements of robbery because the robbery victim did not own the property. Because Chavers used force to take property in the possession of the victim, we reject his insufficiency of the evidence argument.

Chavers further contends that the trial court erred in denying his motion for discovery under the Racial Justice Act (RJA) to support his claim that racial bias infected his case. We conclude the trial court misapplied the applicable legal standards and erred by denying Chavers's discovery motion.

Chavers finally contends that the abstract of judgment should be corrected because it does not reflect the trial court's ruling regarding his fees and fines. Because we reverse the conviction, we need not reach this issue

[1]    Undesignated statutory references are to the Code of Civil Procedure.

[2]    References to individuals as "African-American" or "Black" generally track the identification terms used in the record, which varied depending on the issue. (Cal. Style Manual (4th ed. 2000) § 5:1.)

The judgment is reversed and the matter remanded for a new trial, with directions specified below.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2020, in a neighborhood in Rialto, Chavers punched "Milo"[3] in the face, causing him to black out and drop to the ground. Milo sustained multiple facial fractures and could not work for a year.

Milo and three friends, Manny, Juan, and Aji, had arranged to meet Chavers about a backpack-style leaf blower Chavers listed for sale on an online marketplace. Milo and his friends believed that the leaf blower had been stolen from Manny's father, Luis.

When Chavers appeared with the leaf blower, Milo recognized it as Luis's based on the chicken wire used to repair the right strap. Chavers set the leaf blower on the ground. Milo grabbed it by the straps to check where the chicken wire was on it. Chavers offered to let Milo try it to make sure it worked. At Milo's request, Juan picked up the leaf blower and started it. Juan had used Luis's leaf blower once or twice before, and he believed the leaf blower Chavers was selling belonged to Luis.

Milo falsely told Chavers that the leaf blower belonged to Milo's father, that it had been stolen and they were going to take it back. At Milo's instruction, Juan picked up the machine and put it on his back using the backpack straps.

The group began to walk away. Chavers ran between the group and their car. He stood face to face with Milo, who was in front. Milo glanced to his left at Aji and Juan, who were behind him. As Milo's head was turned,

_____

[3] Consistent with California Rules of Court, rule 8.90(b)(4) and (b)(11), the victim is referred to by his nickname and the witnesses by a nickname or their first names.

3

Chavers punched Milo. Milo blacked out and fell to the ground onto his face. Juan put down the leaf blower and he and Aji went to help Milo. They saw Chavers pick up the leaf blower and run off with it. Both Juan and Aji took a few steps towards Chavers as if to chase him, but almost immediately returned to Milo's side. They helped him to Manny's car.

Milo sustained multiple facial bone fractures, including a nasal bone fracture, and a broken eye socket. These injuries were consistent with blunt force trauma or a punch to the face. He also had "pneumocephalus," or "air in the head," which created a life-threatening risk of an infection to the brain. Milo was unable to work for a year.

Chavers claimed in a recorded interview with police officers and at his trial that he punched Milo in self-defense. He explained that a friend, "Malik," asked him to sell the leaf blower, which was owned by Malik and Malik's father. Chavers did not know their last names. Chavers said he got scared when "five Mexicans" got out of a car and approached him at the meeting spot. After Milo said that the leaf blower belonged to his father, Chavers cut off Milo and the others as they walked towards their car with the blower so that he could reason with them. Chavers saw Milo "flinch" at him with "balled up" fists. Believing he was about to be "jumped," Chavers punched Milo and took off running. He tripped on a curb, and three of the men caught up with him and punched and kicked him for five to seven minutes. When they stopped, Chavers grabbed the leaf blower and ran back to his friend's house. Chavers did not believe the blower belonged to them. Chavers said he went to a hospital for his injuries from the beating, which he described as a broken finger and bruises.

Chavers was initially arrested for violating Penal Code section 243, subdivision (d), battery with serious bodily injury. The San Bernardino

4

District Attorney's Office subsequently him charged by complaint and information with a violation of Penal Code section 245, subdivision (a)(4), assault with great bodily injury. At the preliminary hearing, the defense subpoenaed Milo and two other witnesses. They each invoked their Fifth Amendment right against self-incrimination and did not testify. After the preliminary hearing, the District Attorney added a charge for robbery in violation of Penal Code 211.

After a jury trial at which the witnesses and Chavers testified, the jury convicted Chavers of the robbery charge. The jury was unable to reach a verdict on the assault charge, which was dismissed.

## DISCUSSION

### I. *Peremptory Challenge of Prospective Juror No. 10*

Chavers asserts the judgment must be reversed and the matter remanded for a new trial because the trial court violated his statutory rights under section 231.7 by failing to sustain his objection to the prosecutor's peremptory challenge of Prospective Juror No. 10 ("PJ10"), the only African-American male in the venire. The Attorney General responds that the court properly overruled Chavers's section 231.7 objection, because there was no substantial likelihood that an objectively reasonable person would view race as a factor in the peremptory challenge since PJ10 (1) "candidly and unabashedly" repeated that he could not convict a driver who drove two miles per hour over the speed limit, and (2) was "not being entirely forthright about his history."

Chavers's contention has merit. As we explain more fully below, the prosecutor's two stated rationales were implausible and unsupported by the record. Viewing the totality of the circumstances as we must, we hold there is a substantial likelihood that an objectively reasonable person, aware of

implicit and institutional biases, would view PJ10's race as a factor in the prosecutor's use of the peremptory challenge. Concluding that the objection was erroneously overruled, we reverse the conviction as required by section 231.7, subdivision (j).

A. *Section 231.7*

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759–760.) " ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' " (*Ibid.*) "Excluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude.' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157.)

Before January 1, 2022, trial courts examined peremptory challenges under the three-step inquiry established by *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*; together (*Batson/Wheeler*). (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 791 (*Ortiz*).) Under that three-step inquiry, "the party objecting to a peremptory challenge had to first demonstrate a prima facie case of discriminatory purpose. [Citation.] The burden then shifted to the party exercising the peremptory challenge to provide a permissible, nondiscriminatory explanation. [Citation.] The third step required the trial court to decide if 'purposeful' discrimination motivated the peremptory challenge." (*People v. Uriostegui* (2024) 101 Cal.App.5th 271, 277–278 (*Uriostegui*).)

6

But after "studies showed that the existing *Batson/Wheeler* analysis . . . was inadequate to prevent racial discrimination," the "Legislature enacted section 231.7, effective in criminal trials beginning January 1, 2022, to establish 'a new process for identifying unlawful bias in the use of peremptory challenges during jury selection.' " (*People v. Jimenez* (2024) 99 Cal.App.5th 534, 539–540 (*Jimenez*).)

In contrast to the three-step *Batson/Wheeler* procedure, under section 231.7, there is no requirement that the objecting party first make a showing of purposeful discrimination. (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943.) Rather, "upon objection . . . , the party exercising the peremptory challenge *shall* state the reasons the peremptory challenge has been exercised." (§ 231.7, subd. (c), italics added.) The trial court "shall evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances." (*Id.*, subd. (d)(1).) In doing so, "[t]he court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Ibid.*; *People v. Hinojos* (2025) 110 Cal.App.5th 524, 540–541 (*Hinojos*).)

Unlike in the *Batson/Wheeler* analysis, the ultimate question for the trial court is not whether the party exercising the peremptory challenge engaged in "purposeful discrimination." (§ 231.7, subd. (d)(1).) The statute expressly recognizes that discrimination in violation of this section need not be purposeful, but may involve "unconscious bias," which "includes implicit and institutional biases." (*Id.*, subds. (d)(1) & (d)(2)(C).)

The trial court shall sustain the objection to the use of the peremptory challenge "[i]f the court determines there is a substantial likelihood that an objectively reasonable person [aware that unconscious bias, in addition to

7

purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California], would view race . . . as a factor in the use of the peremptory challenge."  (§ 231.7, subds. (d)(1), (2)(A); *Hinojos, supra*, 110 Cal.App.5th at p. 541.)  The statute defines "substantial likelihood" as "more than a mere possibility but less than a standard of more likely than not." (§ 231.7, subd. (d)(2)(B).)  Section 231.7, subdivision (d)(3) provides a non-exhaustive list of circumstances the court may consider in its analysis.[4]

Section 231.7, subdivisions (e) and (g) provide two separate lists of presumptively invalid reasons for exercising a peremptory challenge.  Each of these subdivisions "sets out a distinct process by which a court determines

---

[4]     These include:
•       Whether the defendant "is a member of the same perceived cognizable group as the challenged juror."  (§ 231.7, subd. (d)(3)(A)(i).)
•       Whether the alleged victim "is not a member of that perceived cognizable group."  (*Id.,* subd. (d)(3)(A)(ii).)
•       Whether witnesses "are not members of that perceived cognizable group."  (*Id.,* subd. (d)(3)(A)(iii).)
•       "The number and types of questions posed to the prospective juror," including whether "the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge."  (*Id.,* subd. (d)(3)(C)(i).)
•       "Whether the party exercising the peremptory challenge asked different questions of the potential juror against whom the peremptory challenge was used in contrast to questions asked of other jurors from different perceived cognizable groups about the same topic or whether the party phrased those questions differently."  (*Id.,* subd. (d)(3)(C)(iii).)
•       "Whether other prospective jurors, who are not members of the same cognizable group as the challenged prospective juror, provided similar, but not necessarily identical, answers but were not the subject of a peremptory challenge by that party."  (*Id.,* subd. (d)(3)(D).)
•       "Whether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record."  (*Id.,* subd. (d)(3)(F).)

8

whether a presumptively invalid reason can be absolved of that presumption." (*Ortiz, supra,* 96 Cal.App.5th at p. 793.)

Presumptively invalid reasons listed in subdivision (e) include that the juror "[expresses] a distrust of or [had] a negative experience with law enforcement or the criminal legal system," or "[has] a close relationship with people who have been stopped, arrested, or convicted of a crime," and "[a]ny justification that is similarly applicable to a questioned prospective juror or jurors, who are not members of the same cognizable group as the challenged prospective juror, but were not the subject of a peremptory challenge by that party." (§ 231.7, subds. (e)(1), (3), (13).) To overcome the presumption of invalidity under subdivision (e), "the party exercising the peremptory challenge [must] show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's [actual or perceived membership in a cognizable group], and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (*Id.,* subd. (e).)

Separately, section 231.7, subdivision (g)(1) identifies reasons that may be presumptively invalid because they have been "historically . . . associated with improper discrimination in jury selection." (§231.7, subd. (g)(1).) These include that "[t]he prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor." (§ 231.7, subd. (g)(1)(B).) These reasons "are presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred" and "the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (§ 231.7, subd. (g)(2); *People v. SanMiguel* (2024) 105 Cal.App.5th 880, review granted Dec. 18, 2024, S287786.)

9

If the court determines that the party seeking to exercise the peremptory challenge has overcome the presumption of invalidity as to any of the presumptively invalid reasons, the court may consider that stated reason in its section 231.7, subdivision (d)(1) analysis as to whether it is substantially likely that a reasonable person would consider race a factor in the challenge. (*Ortiz, supra,* 96 Cal.App.5th at p. 805.)

The denial of an objection shall be reviewed de novo, with the trial court's express factual findings reviewed for substantial evidence. (§ 231.7, subd. (j).) Erroneous denial of a challenge is deemed prejudicial and requires reversal of the judgment and remand for a new trial. (*Ibid.*)

B. *The Court's Voir Dire*

Jury selection in Chavers's case began in November 2022, about ten months after section 231.7 became operative. (§ 231.7, subd. (i).) Prospective jurors first completed a written questionnaire in the jury assembly room, then proceeded to the courtroom where the court, the prosecutor, and the defense attorney questioned the prospective jurors.

PJ10 was an African-American man employed as an architect. He had previously served on a jury that had reached a verdict. To the inquiry on the questionnaire asking "Have you or anyone you know ever had a negative experience with the courts or law enforcement?" PJ10 wrote "Yes, don't recall specifics of who or what." He wrote similar responses to questions asking "Have you or anyone you know ever been arrested or convicted of a crime?" and "Have you and or anyone you know ever been a victim or witness of a crime?"

The court asked PJ10 about this part of his questionnaire:

"The court: [from the questionnaire] 'negative experience with law enforcement or courts.' You put 'Yes.' You don't recall the specifics?

10

"[PJ10]: Just generally.

"The court: Who are you referring to?

"[PJ10]: I have family members or friends that I know have been in the court system. I just didn't want to put no because I'm sure that they do.

"The court: Been through the court system in what capacity?

"[PJ10]: I don't have any details or recollection, just a general knowledge that I'm sure people that I know have, and have been incarcerated as well.

"The court: Okay, okay. So they've been through the system as a defendant?

"[PJ10]: Yeah.

"The court: What county or state would this be in mostly?

"[PJ10]: The ones that I can remember would be Clark County in Nevada.

"The court: Are these people you grew up with or people you know as an adult?

"[PJ10]: Ex-brother-in-law.

"The court: I see. Can you give me other relationships you have with some of these people?

"[PJ10]: People at church that I know have come through the system.

"The court: So some friends, ex-relative. Do you have contact with these people now?

"[PJ10]: No.

"The court: You don't really know the specifics of what their situation was?

"[PJ10]: No.

"The court: Anything about what they went through that prevents you from being a fair juror in this case?

"[PJ10]: No sir.

"The court: [from the questionnaire] 'Arrested or convicted of a crime?' You put 'Yes, same answer.' Are you referring to the same people?

"[PJ10]: The same.

"The court: And then 'victim or witness of a crime?' 'Yes.' Are you referring to the same people or other—

"[PJ10]: Just the same general understanding. No specific knowledge of anything.

"The court: People you know that have been through the criminal justice system?

"[PJ10]: Yes.

"The court: But that would not affect your ability to be fair?

"[PJ10]: No sir."

Neither the attorneys nor the court questioned PJ10 further about his answers to these questions.

C. *Attorney Voir Dire*

During defense counsel's voir dire, PJ10 confirmed he understood it was the prosecution's burden to prove guilt beyond a reasonable doubt, and believed that the prosecutor would have to present evidence that would prove the defendant was guilty. Addressing defense counsel, PJ10 said, "I don't mean to say I don't care what you say, but . . . until [the prosecutor] can prove to me that he is guilty, then I think he's innocent. Because a young man's life is on the line and that's serious. That's very, very serious." He also agreed that since it was the job of the prosecution to prove the case, the

12

defendant would not have to testify in order for PJ10 to return a verdict in favor of the defense.

When it was her turn for voir dire, the prosecutor asked jurors to consider a case in which a driver had been caught going 200 miles per hour in a 65 mile-per-hour zone. She addressed this hypothetical to Prospective Juror No. 34 (PJ34), the one African-American female potential juror in the jury pool,[5] and asked if PJ34 would have any problem convicting on those facts. PJ34 said she would not. The prosecutor then modified the hypothetical to ask whether PJ34 would have any difficulty convicting someone who was caught going 67 miles per hour in a 65 mile-per-hour zone. When PJ34 said she would not have a problem convicting that person, the prosecutor pressed, saying "I've had jurors say, no, I can't convict him . . . because there's a grace limit."[6]

Later the prosecutor spoke to PJ10, saying that she had seen him shaking his head when the 67 versus 65 mile-per-hour scenario was discussed. PJ10 explained he would have a problem convicting that person due to "the grace. The reason, I know that I don't drive 65, and wouldn't, it's just an application to life." The prosecutor answered, "I understand that, that's fine, I think it's fair. I can't speak for everyone, but we all speed, right? Hopefully we don't get caught." Another juror, Prospective Juror No. 26 (PJ26), also expressed belief in "the grace speed limit situation."

---

[5]     During voir dire the parties and the court believed PJ34 might be African-American, but were unsure. After deliberations, another juror described PJ34 as an African-American female.

[6]     The prosecutor explained the "grace limit" as people's belief that they would not get ticketed if driving within 5 miles over the speed limit.

The prosecutor presented the same scenario to the rest of the jury pool, and a total of nine jurors (counting PJ10) indicated they would have trouble convicting the person going 67 in a 65 mile-per-hour zone. After some further explanation by the prosecutor about the importance of following the law despite one's own feelings, she said, "Raise your hand if you can put your feelings aside and follow the law regardless of how de minimis or 'grace amount' you think that there might be, can you follow the law? If you can follow the law, please raise your hand." PJ10 raised his hand along with most of the venire. Two jurors did not: Prospective Juror No. 59 and Prospective Juror No. 5.

The court then intervened and read to the jury the instruction about following the law, even if jurors disagree with it, and asked for anyone who felt they could not do this. No one raised their hands. Even though no one raised their hands, the court specifically followed up with PJ26 and PJ10. When the court asked, "Can you do that, follow that?" PJ26 answered in the affirmative. The court then addressed PJ10, as follows:

"The court: [PJ10], can you do that?

"[PJ10]: I believe so, based upon my judgment after hearing the evidence.

"The court: Pass the microphone down. I need a commitment from you now and I'll read it again. 'You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions.' Can you do that?

"[PJ10]: I believe so. Yes.

"The court: Can you do it?

14

"[PJ10]: Yes. If we're talking in conjunction with the issue of 65 versus 67?"

The court said it was not going to explain the law applicable to Chavers's case but just wanted to know whether PJ10 could follow the law as the court explained it, even if the juror disagreed. PJ10 answered "Yes."

D. *Juror Strikes*

The parties stipulated to striking Prospective Juror Nos. 21, 59, and 44 for cause.

The prosecutor moved to strike PJ10 for cause, explaining that only after the judge "pressured" him did PJ10 agree he could follow the law, and arguing PJ10 "said it to you and said it to me both times saying he would have a problem with following the law," apparently referring to PJ10's disagreement with convicting the person driving a few miles over the speed limit. Defense counsel objected, stating that when the court asked if PJ10 could follow the law, he indicated that he could. The judge denied the for-cause motion, saying, "when I pushed him and told him 'forget about the hypothetical,' he said, 'Yes.' So I don't think there's enough there for cause."

The prosecutor next moved to strike for cause PJ5 and PJ26, (mistakenly) arguing that they were the only two prospective jurors who raised their hands saying they could not follow the law if they disagreed.[7] Defense counsel objected, contending they had been rehabilitated by the court.

The court said it had addressed PJ26 and PJ10 because the speeding hypothetical had come up specifically with them. The court denied the for-cause challenge, explaining, "I don't think them saying they would find

7      The two jurors who raised their hands were PJ5 and PJ 59. PJ 59 had already been stricken for cause.

15

someone not guilty going 67 in a 65 means they can't follow the court's instruction that I read them right after counsel's voir dire right from the jury instruction."

The prosecutor then exercised her first peremptory challenge on PJ10. Defense counsel objected under section 231.7. The prosecutor stated her reasons as follows:

"One of the reasons is because when I gave the hypothetical situation of a suspect who was going 67 in a 65, [PJ10] indicated that he would have issues following the law . . . . [H]e indicated that he would have a problem convicting that person in that hypothetical because he said that he thinks it's just too minimal of a conduct. I believe when one of the other witnesses or jurors, I think [PJ26] mentioned the grace amount, and [PJ10] was nodding his head. [W]hen I went over it with the other juror, [PJ10] was visibly agitated, he was shaking his head. So that's when I switched from that other juror to [PJ10] to ask him more about this. And towards the end of my voir dire, when I ran out of time, I then reiterated it, and several jurors, including [PJ10] also indicated they had an issue with this.

"I know that the court tried to rehabilitate him by asking if he could follow the law, and he said, 'I believe so,' and then the court pressed some more and under that pressure he did say, 'yes,' he could follow the law. However, that in addition to the fact that in his questionnaire he indicated several answers 'don't recall specifics of who or what period' the court then questioned him more, and it turned out that he did know more. He said specifically family and friends have been through the court system. He knows people had cases, can't remember specifics, but then he could remember that it was in Nevada in Clark County for his ex-brother-in-law, and for people at his church that he has no contact with now.

16

"At this point I think that he is not being entirely forthright about his history, and I have concerns. So for those reasons I am asking for my peremptory to be granted."

Defense counsel noted that PJ10 was not the only juror that had a problem with convicting on a 67 versus 65 mile-per-hour scenario, but when the court read the law PJ10 said he would follow the law, after clearing up whether the court was describing "67 in a 65 or any crime." Defense counsel also pointed out that PJ10 was willing to hold the prosecution to their burden of proof, and that the prosecutor only initially questioned the two African-American potential jurors, PJ34 and PJ10, using the speeding hypothetical, but when the question was asked more broadly many other jurors raised their hands. Defense counsel also argued that the prosecutor's rationale about PJ10's questionnaire answers went directly to a presumably invalid factor: distrust or negative experience in law enforcement. (§ 231.7, subd. (e)(1).) She stated that PJ10 provided more detail when the court questioned him, and argued that the single line on the questionnaire was not enough space for PJ10 to fill in all the details he had. She also cited Chavers's right to be tried by a "jury of [his] peers," pointing out there were "not very many Black male jurors" in the jury pool.[8]

The court said it agreed with almost everything that defense counsel said about PJ10. Specifically, as to "being kind of vague on people he knows who have been through the criminal justice system," the court stated, "I don't have any problem with that. It didn't—I don't see anything that would cause him to be unfair, he just, over the years, has known people that have been in trouble. Doesn't seem unusual to me."

---

[8]    The court later acknowledged that PJ10 was the only one.

17

The judge commented that the prosecutor presented the 67 versus 65 mile-per-hour hypothetical in a way that would induce jurors to say they would not convict that person. The court said, "You have to follow up and say, that's not the law. Most people understand that once you explain it to them." The court also declined to make any findings about PJ10's demeanor or body language, such as whether he was "visibly agitated" and shaking his head about the speeding hypothetical, as the prosecutor alleged.

Having addressed the prosecutor's two stated reasons, up to this point, the court emphasized, it would have agreed with the defense objection. But under the "totality of the circumstances," the court said PJ10 "seemed hesitant" to follow the law, and the court had to "push him." The court overruled the objection and granted the challenge.

The prosecutor exercised her only other peremptory challenge against a Hispanic juror, Prospective Juror No. 6, because she said she disagreed that everyone is innocent until proven guilty.

E. *Analysis*

Based on our de novo review of the record and the totality of the circumstances, we conclude that there is a "substantial likelihood" that an objectively reasonable person would view race or perceived race as a factor in the prosecutor's peremptory challenge of PJ10. (§ 231.7, subd. (d)(1).)

We conclude that the prosecutor's two stated rationales were implausible and unsupported. The prosecutor first argued that PJ10's reluctance to convict a driver going 67 miles per hour meant that he would have "issues following the law." The court directly denied such a claim in rejecting challenges for cause, explaining, "I don't think them saying they would find someone not guilty going 67 in a 65 means they can't follow the court's instruction that I read them right after counsel's voir dire right from

18

the jury instruction." We agree with the judge's analysis of the minimal value of this hypothetical. In response to the prosecutor's invitation to share his honest views, PJ10 expressed empathy with the accused in that scenario, and referred to "grace," explaining PJ10 himself did not always drive at the speed limit. The prosecutor endorsed his and other jurors' honest reactions, saying that she understood, and repeatedly commenting it was "fair" that jurors might not convict a person going 67 miles per hour. In response to PJ10's comments, the prosecutor affirmatively included herself in the category of wrongdoers: "We all speed, right?" The court understandably chided the prosecutor for baiting the jurors into agreeing they could not convict, without clearly following up on the need to follow the law, which most jurors would agree with once they understood.

We conclude where the prosecutor said it was understandable to be sympathetic to law violations of which she was guilty herself, it was implausible to cite the juror's sympathy to such a wrongdoer as an outright refusal to follow the law. Such a setup would preclude all jurors who were willing to apply their common sense and life experience to their jury service, which is as much as the 67 vs. 65 mile-per-hour scenario revealed. Moreover, the prosecutor's conclusion that even at the end of her voir dire, PJ10 remained immovable in his reluctance to convict the person going a few miles over the speed limit is unsupported. The record shows she successfully rehabilitated most of the juror pool, and PJ10 raised his hand along with all of the jurors except two in saying they would follow the law.

The prosecutor's second stated reason was that PJ10 was "not being entirely forthright about his history," citing the additional details he supplied in court compared to his limited questionnaire answers. This rationale is also implausible and not supported in the record. (§ 231.7, subd. (3)(A)(F).)

19

Nothing about his answers in court suggested PJ10 had omitted anything about *his history* of involvement with law enforcement, the courts, or crime. His answers in court indicated that he was referring to church friends and an ex-relative with whom he no longer had contact, not anything about his own criminal history.

The Attorney General claims PJ10 "suddenly" remembered information in court, and argues the "contradictions or incongruities between his written and oral answers" suggested that PJ10 was being dishonest in his answers about law enforcement experiences. The Attorney General argues PJ10 may have violated the juror's oath to respond truthfully to the void dire examination, and intimates PJ10 may have provided false answers.

The record does not support either the prosecutor's or the Attorney General's claims. PJ10's answers were consistent on the questionnaire, at the beginning of the voir dire, and at the end. In fact, in our view PJ10 was especially conscientious about trying to accurately answer the questionnaire. He answered "yes" even though he did not recall specifics, explaining in court that he was sure he knew people who had been in the court system so he did not want to answer no. The court asked for locations and relationships of the people PJ10 had in mind, which PJ10 provided. He did not "suddenly" come up with answers; at the end of this questioning PJ10 again reiterated that he did not know the specifics of the situations those individuals faced, which is consistent with what he indicated on the questionnaire. And nothing about his answers to either the questionnaire or the court's questions suggested deception about his own criminal history.

The topic of PJ10's alleged failure to be forthright concerned people PJ10 knew who had been through the criminal justice system, which touches two potentially invalid rationales: a distrust of, or having a negative

20

experience with law enforcement or the criminal legal system; or close relationships with people who have been stopped, arrested, or convicted of a crime. (§ 231.7, subds. (e)(1), (3).) Defense counsel argued that the rationale was thus presumptively invalid. The Attorney General counters on appeal that the prosecutor's concern was PJ10's unwillingness to be forthright, whatever the topic. We must focus on the reason actually given, and not speculate on whether the prosecutor would have provided the same reason "if PJ10 had been instead deceptive or vague about his jury experience or familiarity with a news story," as the Attorney General suggests. (§ 231.7, subd. (d)(1).) The prosecutor cited PJ10's failure to be forthright about "his history"—and not the history of distant relatives or former acquaintances— which raises the concern that the prosecutor believed PJ10 was concealing something about *his own* involvement in crimes.

Even so, such a stated rationale does not fall neatly into any of the presumptively invalid categories identified in the statute, since PJ10 did not describe having a negative experience with law enforcement or a close relationship with someone convicted of a crime (§ 231.7, subds. (e)(1), (3)), notwithstanding the prosecutor's apparent suspicion that he had concealed such information. But we view this rationale as presumptively invalid for a different reason than invoked by defense counsel at trial. Section 231.7, subdivision (e)(13) includes among the list of presumptively invalid rationales: "[a]ny justification that is similarly applicable to a questioned prospective juror or jurors, who are not members of the same cognizable group as the challenged prospective juror, but were not the subject of a peremptory challenge by that party." (§ 231.7, subds. (e)(1), (3), (13).) There were varying degrees of discrepancies between questionnaire answers and verbal answers in court by other jurors who were not identified as African-

21

American. Jurors forgot to answer questions entirely, then addressed them in court; omitted material information about themselves; and were vague about details, such as what specific charges a relative had faced in the criminal justice system.[9] The prosecutor did not exercise peremptory challenges on any of these other non-African-American jurors for "failure to be forthright" or discrepancies between how they answered their questionnaires and how they responded when the court asked. This was the case even though some jurors omitted information that pertained to their biases or ability to be jurors.

---

[9] For example, Prospective Juror No. 17 said she incorrectly answered the question about whether she or anyone she knew had been arrested. She believed the question only asked about her own arrests. In court she clarified that her boyfriend had been arrested, and she was with him when he got arrested. Prospective Juror No. 58 said he had a distant cousin who had been arrested or convicted, possibly of battery or related crimes, but he was unsure of the locations where he was charged and was vague on when those crimes occurred. Prospective Juror No. 24 said he had so many friends in law enforcement that he "didn't even remember." He omitted from his questionnaire that his father was a retired law enforcement officer. He acknowledged he incorrectly answered the question about whether he or anyone he knew had been arrested or convicted of a crime, and said in court his girlfriend had gotten a DUI. Prospective Juror No. 25 mentioned he had hearing difficulties and acknowledged that he omitted one of his impairments on the questionnaire. In court he said he has attention deficit disorder, which he believed would affect his ability to be a juror. Prospective Juror No. 25 did not answer question No. 12 on the questionnaire at all, which asked, "Everyone is innocent until proven guilty in court even if they have been arrested or charged with a crime," and asked the juror to check "I agree," "I disagree," or "I do not understand." Prospective Juror No. 25 provided his answer in court. Prospective Juror No. 13 also failed to answer that question on the questionnaire, and another one which stated "I will be fair and impartial to both sides" and asked jurors to select "I agree," "I disagree," or "I do not understand." She also answered these questions for the first time in court.

For a presumptively invalid reason under section 231.7, subdivision (e), we would look to the prosecutor to show by clear and convincing evidence that an objectively reasonable person would view the stated rationale as unrelated to a prospective juror's actual or perceived race, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case. (§ 231.7, subd. (e).) Here, the Attorney General contends that PJ10's failure to be forthright in his responses led to a concern about PJ10's impartiality. PJ10's alleged dishonesty in one area would lead the prosecutor to be "justifiably skeptical of the truthfulness of his answers in other areas of questioning" and his willingness to uphold his duties as a juror.

The prosecutor did not mention she was skeptical about the truthfulness of PJ10's answers to other questions, and we cannot speculate on or assume the existence of other possible justifications. (§ 231.7, subd. (d)(1).) Even if she had stated general skepticism of PJ10's honesty, we do not believe the explanation provided meets the clear and convincing standard. We agree with the trial court's reasoning that PJ10 "being kind of vague on people he knows who have been through the criminal justice system" was not unusual, and nothing that would cause PJ10 to be unfair. (See *People v. Wilson* (2023) 14 Cal.5th 839, 851 [record did not establish that the juror had intentionally concealed information, and any unintentional concealment of his views did not render him unable to perform his duty as a juror.].)

We further note that a suspicion that an African-American man may have had more criminal justice contacts than he was willing to admit—or be generally dishonest in multiple areas of questioning—invokes an implicit bias

associating African-American males with criminality and a stereotype of dishonesty.[10]

After rejecting the prosecutor's two rationales as implausible, we are left with, as the trial court was, the notion that PJ10 "seemed hesitant" and had to be "pushed" to agree to follow the law even if he disagreed with it. Even were we to credit this as a credibility finding by the court, we conclude on a totality of the circumstances that there is more than a mere possibility that an objectively reasonable person aware of both implicit and explicit bias, would view PJ10's race as a factor in the prosecutor's peremptory challenge.

As we must view the totality of the circumstances in evaluating whether a peremptory challenge violates section 231.7, we consider a number of factors on the enumerated list that the trial court did not mention. First, the prosecutor failed to question PJ10 about his alleged evasiveness. The prosecutor questioned the jurors at length—including on the speeding scenario—but did not devote a moment to the rationale that she later relied on to challenge PJ10. (See § 231.7, subds. (d)(3)(C)(i) & (ii) [court may consider the party's failure to question prospective juror about the cited concerns, or engaged in cursory questioning]; *Uriostegui, supra,* 101 Cal.App.5th 271, 280 ["it is significant that the prosecutor did not question

---

10     See Smith et al., *The Impact of Implicit Racial Bias on the Exercise of Prosecutorial Discretion* (2012) 35 Seattle U. L.Rev. 795, 819 ["In addition to the stereotype that black citizens are prone to criminality (and thus might sympathize more with those who commit crime), prosecutors might associate black citizens with lack of respect for law enforcement"]; see also *People v. Simmons* (2023) 96 Cal.App.5th 323, 336 [prosecutor's argument "equate[d] appellant's skin tone and 'ethnic presentation' with deception"]; Prasad, *Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response* (2018) 86 Fordham L. Rev. 3091, 3105 ["Black dishonesty is a racial stereotype that commonly enters prosecutorial summations . . . ."].

[prospective juror] T.N. regarding [the rationale provided for a peremptory challenge], which raises an inference of discrimination"]; *People v. Garcia* (2025) 115 Cal.App.5th 92 [failure to question [prospective juror] D.M. about either of her stated concerns weighed in favor of a finding that a reasonable person would view race as a factor in her challenge]; *Hinojos, supra,* 110 Cal.App.5th at p. 546 [lack of meaningful voir dire on a subject of purported concern can, in some circumstances, be circumstantial evidence suggesting the stated concern is pretextual].)

And, as indicated above, the prosecutor picked out this rationale on the basis that it signaled the juror's inability to be fair and impartial, but did not rely on it to exercise any peremptory challenges against any other jurors who were vague, suddenly remembered information in court, or omitted material information on the questionnaire by failing to answer the questions at all. (Cf. *Jimenez, supra*, 99 Cal.App.5th at p. 546 [prosecutor who "consistently" sought to excuse or challenge prospective jurors who shared the same rationale helped overcome a presumptively invalid factor].)

Whether the prosecutor asked different questions of the potential juror in contrast to questions asked of other jurors from different perceived cognizable groups about the same topic, or whether the party phrased the questions differently, is also a factor to consider. (§ 231.7, subd. (d)(3)(C)(iii).) As the defense counsel noted, the prosecutor presented the 67 versus 65 mile-per-hour hypothetical first to PJ34 and then to PJ10, the only two jurors identified as African-Americans in the venire.

Another enumerated factor is whether other prospective jurors, who are not members of the same cognizable group as the challenged prospective juror, provided similar, but not necessarily identical, answers but were not the subject of a peremptory challenge by that party. (§ 231.7, subd. (d)(3)(D).)

25

Nine jurors initially expressed a problem with convicting the 67 mile-per-hour speeder, and even after extensive efforts at rehabilitation by the prosecutor, two jurors, PJ59 and PJ5, were resolute in indicating they could not put their feelings aside and follow the law "regardless of how de minimis or 'grace amount' " there might be.  The trial court rejected a for-cause challenge on this basis as to PJ5, finding that such a position was not inconsistent with following the law.  Incredibly, despite the handwringing over PJ10's answer to this hypothetical, the prosecutor did not exercise a peremptory challenge against PJ5, a White male.  PJ5 was ultimately seated on the jury that convicted Chavers. [11]

And unlike other cases in which denials of peremptory challenges have been affirmed, where the prosecutor's consistent pattern of challenges helped reinforce a race-neutral inference, see *Jimenez, supra,* 99 Cal.App.5th at page 546, the record is mixed as to the prosecutor's pattern of exercising peremptory challenges.  The prosecutor did not attempt to challenge both of the African-Americans on the jury and accepted a jury with one African-American female juror.  But the prosecutor did not consistently exercise

---

[11]    The Attorney General attempts to distinguish PJ5 from PJ10, and, without providing any citations to the record, argues PJ5 did not "demonstrate the same level of resistance" to following the law as PJ10 did, and instead PJ5 "effortlessly" agreed to follow the court's instructions.  The Attorney General must have missed the part of the record where PJ5 and one other juror (not PJ10) were the only two in the venire who signaled they would *not* follow the law if they disagreed.  The Attorney General is thus correct in one regard—PJ5 did not demonstrate the same level of resistance to following the law; PJ5 demonstrated *more* resistance than PJ10.  The only indirect indication that PJ5 *ever* agreed to follow the law applies equally to PJ10—that is, in response to the court's question asking if anyone felt they could *not* follow the law, the record does not reflect that either PJ5 or PJ10 raised their hands.  We do not find this argument persuasive.

26

challenges against those who shared PJ10's alleged vagueness, or his position on the speeding hypothetical.

We decline to contradict the trial court's assessment that PJ10 was "hesitant" and seemingly had to be "pushed," but we do note that the extended colloquy in which these answers were given occurred after PJ10 had already indicated his assent to apply the law to de minimis law violations.[12] PJ10 reasonably tied his position to the evidence, explaining, "I believe so, based upon my judgment after hearing the evidence." When the court's persistent questioning signaled that PJ10's judgment based on the evidence was not enough, PJ10 expressed confusion over whether the judge had reverted to the speeding hypothetical. PJ10's answer was unequivocal when the court clarified the law. An objectively reasonable person would have perceived that PJ10 was subject to heightened questioning and skepticism by the court regarding his commitment to follow the law, as compared to the court's treatment of, for example, PJ5, who was not targeted for follow-up questioning at all.

The backdrop of this discussion are the enumerated factors at section 231.7, subdivisions (d)(3)(A)(i), (ii), and (iii) that cannot be overlooked: that PJ10 and Chavers are both African-American men, and the victim and

---

[12] At least one court has characterized a description of a juror as "reluctant," among other observations, as potentially falling into the category of a presumptively invalid demeanor-based reason. (*Uriostegui*, *supra*, 101 Cal.App.5th at p. 280.)

27

witnesses are not.[13] It is undisputed that PJ10 was the only African-American man in the venire.[14]

On this record, given the totality of the circumstances, we have no difficulty concluding that there is more than a mere possibility that an objectively reasonable person would view race as a factor in the use of the peremptory challenge against PJ10. The prosecutor's reasons were implausible and unsupported. We balance the remaining observation that PJ10's "seemed hesitant" to follow the law against other enumerated factors—including the racial identities of the prospective juror, defendant, and victim; that the prosecutor accepted PJ5, who refused to follow the law; that the prosecutor did not question PJ10 or any other juror, nor challenge any other juror, on alleged "evasiveness"; that the court singled out PJ10 for additional questioning after he repeatedly said he could follow the law; and PJ10's expressions of empathy with the accused.

---

[13]   Chavers described the victim and his friends as "Mexicans." The surnames of Milo, Juan, Aji, and Manny are consistent with a Hispanic or Latinx ethnicity. Luis, the father of Manny, testified with the assistance of a Spanish-language interpreter.

[14]   In this context, it is notable that PJ10 repeatedly made comments which could be viewed as expressing sympathy with the accused. PJ10 agreed that the prosecutor needed to supply evidence to prove her case because "a young man's life is on the line and that's serious. That's very, very serious." PJ10, and the rest of the jury, could see the age and race of Chavers, who was introduced at the outset of voir dire as the defendant. In PJ10's reaction to the controversial speeding hypothetical, he also put himself in the shoes of the alleged speeder, acknowledging that he does not always drive 65 miles-per-hour.

None of the stated reasons suggested that PJ10 could not fulfill his duties as a juror.[15] He committed to following the law. Our system does not require unequivocally enthusiastic jurors, just fair and impartial ones.[16]

In reaching this conclusion, we need not, and do not, determine whether the prosecutor or judge was motivated by bias. The Legislature intended section 231.7 to "be broadly construed to further the purpose of eliminating the use of group stereotypes and discrimination, whether based on conscious or unconscious bias, in the exercise of peremptory challenges." (Stats. 2020, ch. 318, § 1, subd. (c).) We acknowledge the time, effort, and resources the prosecutors, investigators, and witnesses devoted to the trial of this case. But the Legislature lowered the threshold to eliminate the

---

[15] We do not disregard our high court's teaching that we should view the prospective juror's *gestalt* characteristics rather than nitpick flaws in individual justifications. (*People v. Aguirre, supra,* 18 Cal.5th at p. 733 ["even if we were to assume that one or two of the prosecutors reasons for a strike might raise concerns if viewed in isolation," the reviewing court should consider " 'the persuasive power of all of them, taken together' "].) Weighed against this approach, we recognize that a single pretextual justification may betray discriminatory motive "even where other, potentially valid explanations are offered." (*Ali v. Hickman* (9th Cir. 2009) 584 F.3d 1174, 1192.) A prosecutor's "positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility." (*People v. Smith* (2018) 4 Cal.5th 1134, 1158.) We conducted our "totality of the circumstances" analysis with these considerations in mind.

[16] Cf. *People v. Pearson* (2012) 53 Cal.4th 306, 332 ["[t]o exclude from a capital jury all those who will not promise to immovably embrace the death penalty in the case before them unconstitutionally biases the selection process" and a juror should not be disqualified for failing to "enthusiastically support capital punishment."].

potential for bias in peremptory challenges, and under those standards reversal is required.

## II.    *Sufficiency of the Evidence*

Chavers challenges the sufficiency of the evidence as a matter of law. If the evidence were in fact insufficient to meet the elements of a conviction for robbery, upon remand Chavers would not be entitled to a new trial but to dismissal of the charge against him.  We deny Chavers's argument that the evidence was insufficient as a matter of law.

### A.  *Elements of Robbery*

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (Pen. Code, § 211.)  To prove robbery, the prosecution must establish the defendant took property from the victim "by means of force or fear with the specific intent to permanently deprive him of that property." (*People v. Young* (2005) 34 Cal.4th 1149, 1176-1177.)  The requisite use of force or fear may take place either when the perpetrator gains possession of the property or resists attempts to retake the stolen property.  (*People v. Estes* (1983) 147 Cal.App.3d 23, 28 (*Estes*).)

While "[a] robbery cannot be committed against a person who is not in possession of the property taken or retained" (*People v. McKinnon* (2011) 52 Cal.4th 610, 687), the victim does not have to be the owner of the property (*Estes, supra,* 147 Cal.App.3d at p. 26) and physical possession is not required to establish the element of possession (*McKinnon*, at p. 687).  "A person does not have to actually hold or touch something to possess it.  It is enough if the person has control over it or the right to control it, either personally or through another person."  (CALCRIM No. 1600; *People v. Mullins* (2018) 19

30

Cal.App.5th 594, 603.)  Two or more people may possess something at the same time.  (CALCRIM No. 1600.)[17]

As long as the elements are met, "robbery may be committed against a person who is not the owner of property—indeed, it may be committed against a thief."  (*People v. Hamilton* (1995) 40 Cal.App.4th 1137, 1143; *People v. Covarrubias* (2016) 1 Cal.5th 838, 876 [" 'It is no defense to a charge of robbery (or of theft) that the victim was not the true owner of the property taken.' "].)

When the sufficiency of the evidence is challenged, we must review the entire record in the light most favorable to the prevailing party to determine whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.)  The judgment of the trial court will only be set aside if it clearly appears that upon no hypothesis whatever is there sufficient substantial evidence to support the jury's verdict.  (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

B.  *Analysis*

Chavers contends the evidence was insufficient because Milo "was not the owner of the property nor acting as the owner's agent since the owner directly withheld authorization for the victim to retake the owner's property."

Viewing the evidence in the light most favorable to the jury's verdict, substantial evidence supports Chavers's robbery conviction.

The evidence shows that the leaf blower was in Milo's possession and taken from his immediate presence.  During the meet-up, Chavers set the leaf blower down and permitted Milo to test it to see if it worked.  Milo

_____

17    The court read CALCRIM No. 1600 to the jury.

grabbed it by the straps, then directed Juan to turn it on. Juan picked it up, turned it on, then held onto it as Milo explained to Chavers that the leaf blower belonged to them and they were going to take it back. As directed by Milo, Juan put the machine on his back using the backpack straps. They started walking away, Milo in the lead and Juan carrying the leaf blower on his back. Juan was carrying it because Milo told him to pick it up, signaling that Milo had control over it. This evidence was sufficient to establish that the leaf blower was in Milo's possession and immediate presence, and "so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." (*People v. Mullins*, *supra,* 19 Cal.App.5th at p. 603.)

Thus, whether or not Milo or Juan owned the leaf blower, it was sufficient to satisfy the elements of robbery that the leaf blower was in their collective possession when Chavers punched Milo then ran off with it.

### III. *Chavers's Motion for RJA Discovery*

To guide further proceedings should there be a new trial, we elect to consider Chavers's challenge to the court's denial of his RJA discovery motion. We conclude the trial court's ruling rested on improper legal standards and remand with instructions specified below.

We review the factual underpinnings of a discovery order for substantial evidence, but where such a determination rests on "incorrect legal premises," our review is de novo. (*See Young v. Superior Court of Solano County* (2022) 79 Cal.App.5th 138, 156 (*Young*); *Gonzales v. Superior Court* (2024) 108 Cal.App.5th pp. Supp. 36, 55 (*Gonzales*).)

### A. *Relevant Substantive Provisions of the RJA*

The RJA provides in part:

"(a) The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence, any of the following:

(1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin.

(2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful.

(3) The defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained.

(4) (A) A longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national

33

origins in the county where the sentence was imposed." (Pen. Code, § 745, subd. (a).)

Subdivision (c) of Penal Code section 745 authorizes a defendant to file a motion "at trial . . . as soon as practicable upon the defendant learning of [an] alleged violation," and requires the trial court to hold an evidentiary hearing if "the defendant makes a prima facie showing of [the] violation." At the hearing, evidence may include statistical evidence, aggregate data, expert testimony, and the sworn testimony of witnesses. The defendant has the burden of proving a violation of subdivision (a) by a preponderance of the evidence. (Pen. Code, § 745, subds. (c)(1), (2).) Remedies for a violation of the RJA include declaring a mistrial, empaneling a new jury, vacating the conviction, and ordering resentencing. (*Id.*, subd. (e).)

B. *Law Governing Discovery Under the RJA*

"A defendant may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state." (Pen. Code, § 745, subd. (d).) If the defendant shows "good cause" for the disclosure, "the court shall order the records to be released." (*Ibid.*)

To establish good cause for discovery under the RJA, a defendant is required to "advance a plausible factual foundation, based on specific facts, that a violation of the [RJA] 'could or might have occurred' in his case." (*Young, supra,* 79 Cal.App.5th at p. 159.) This is a notably *less* demanding standard than the prima facie requirement set forth in the statute for granting an evidentiary hearing, and a standard that "should not be difficult to meet." (*Id.* at pp. 160-161; see also *McDaniel v. Superior Court* (2025) 111 Cal.App.5th 228, 244 (*McDaniel*) [trial court should consider the "relevance of the proffered facts to the claims of racial bias to determine whether a

34

minimally plausible basis exists to grant discovery—a low threshold"]; *Gonzales*, 108 Cal.App.5th at p. Supp. 44 [reversing denial of discovery motion where defendant had minimally proffered a plausible factual foundation for a potential violation of the RJA].)

A plausible showing of a violation may be established by statistical data of racial bias in policing, combined with case-specific facts from a defendant's case linked to the policing tactic reflected in the statistics. (*Young, supra*, 79 Cal.App.5th at p. 140 [defendant made "plausible" case of racial profiling in charging practices where data showed Black drivers are stopped by police more often than non-Blacks, and officers closely observed the defendant before pulling him over and used excessive force in arresting him].) Courts have accepted that statistics alone may meet the "minimal" standard for a showing of a plausible violation, if those statistics are specific to the county in which the defendant was charged. (*See Jackson v. Superior Court* (2025) 109 Cal.App.5th 372, 377-378 [statistical evidence showed that San Diego police officers disproportionately conduct traffic stops, execute searches, and use force on Black and Latino residents compared to White residents]; *McDaniel, supra*, 111 Cal.App.5th at pp. 244-246 [county-specific data showed Blacks were overrepresented in rates of arrest, conviction, and incarceration for gang-related charges and enhancements]*; Gonzales, supra*, 108 Cal.App.5th at pp. Supp. 63-64 [statistics showed overrepresentation of individuals referred to as "Latinx" who were arrested and charged for the offense with which defendant was charged].)

To meet his burden to show plausible factual foundation for a RJA violation, a defendant moving for discovery need not tie his claim to one of the four asserted bases under Penal Code section 745, subdivision (a). This is because "[t]he four numbered subparts within [Penal Code] section 745,

subdivision (a) do not describe independent 'violations' of the statute. Rather, they describe different means of proving that the state exercised its criminal sanctions power 'on the basis of race, ethnicity, or national origin' in violation of [Penal Code] section 745, subdivision (a)." (*Young, supra*, 79 Cal.App.5th at pp. 163-164.) "Within this broad scheme, which covers every stage of the prosecutorial process—from investigation through charging, trial, conviction, and sentencing—defendants may pursue different theories supported by different kinds of proof. . . . the evidence offered in support of a theory of violation under one subpart may be corroborative of the evidence supporting another theory of violation under a different subpart." (*Ibid.*; see also *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 830–831 [Penal Code section 745, subd. (c)(1) makes no distinction between the various subparts of subdivision (a), so there is no basis to say that such evidence is admissible only to show certain types of violations and not others].)

A showing of plausible justification is merely a threshold consideration. The *Young* court instructed trial courts ruling on discovery motions to thereafter consider the factors pertinent to discovery requests set forth in *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, specifically, "(1) whether the material requested is adequately described, (2) whether the requested material is reasonably available to the governmental entity from which it is sought (and not readily available to the defendant from other sources), (3) whether production of the records containing the requested information would violate (i) third party confidentiality or privacy rights or (ii) any protected governmental interest, (4) whether the defendant has acted in a timely manner, (5) whether the time required to produce the requested information will necessitate an unreasonable delay of defendant's trial, [and] (6) whether the production of the records containing the requested

36

information would place an unreasonable burden on the governmental entity involved." (*Young, supra,* 79 Cal.App.5th at pp. 144-145.)

Generally, " '[t]he standard of review for a discovery order is abuse of discretion, because management of discovery lies within the sound discretion of the trial court.' " (*Gonzales, supra,* 108 Cal.App.5th at p. Supp. 36.) But " ' "[t]he question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law, requiring de novo review." ' " (*Ibid.*)

C. *Background*

After the jury convicted Chavers of robbery and before his sentencing, Chavers filed a motion for disclosure under Penal Code section 745, subdivision (d), seeking discovery related to racial bias in connection with his robbery charge. Chavers sought the trial court to order the San Bernardino District Attorney to gather and disclose the following:

1. A list of all individuals arrested for a violation of Penal Code section 211 and referred to the District Attorney for prosecution, identifying the date, arresting agency, and race/ethnicity of the individual.

2. Copies of the arrest record for each individual in request No. 1.

3. All defendants charged by the District Attorney with Penal Code section 211, identifying the date of the charge, the case number, and the race/ethnicity of the defendant.

4. Copies of all indictments, complaints, or other types of pleadings for all individuals identified in response to request No. 3.

5. Copies of all e-mails, records, or investigative reports filed, pending, completed, or otherwise made regarding any racial disparities in charging of gun offenses[18] in San Bernardino County.

To meet his burden to establish a plausible factual foundation that a violation of the RJA could or might have occurred (*Young, supra,* 79 Cal.App.5th at p. 159), Chavers asserted the following case-specific allegations as to how race may have affected his prosecution:  (1) the Rialto police officers did not believe him when he said he had been "jumped" and acted in self-defense and instead believed he was the one acting suspiciously; (2) the police asked why he did not call police if he had been attacked, and he answered that he did not call the police, as a rule; (3) the District Attorney filed charges against him but not against the complaining witnesses who attacked him; (4) after the witnesses asserted their Fifth Amendment rights at the preliminary hearing, the District Attorney did not dismiss the case but instead added a charge of robbery in violation of Penal Code section 211;[19] (5) at trial, the court denied his objection to the peremptory challenge of the only African-American male potential juror; (6) during trial, the prosecutor elicited that Chavers did not call the police, which an African-American female juror believed was understandable but other jurors disagreed; (7) and a disproportionate percentage of inmates serving a sentence of robbery from

---

[18]    Chavers was not charged with any gun offenses.

[19]    Chavers views the witnesses' invocation as supporting his claim of self-defense; presumably the argument is that they invoked the Fifth Amendment because they were themselves culpable in the altercation.

San Bernardino County were Black[20] compared to their representation in the population.

In support of his motion, Chavers submitted data collected by the Office of the State Public Defender showing that 983 of the inmates in prison in 2020 for robbery charges out of San Bernardino County (46 percent) were Black, while Blacks made up only about 12.5 percent of the population in the county. Only 300 inmates out of San Bernardino County in prison for robbery were White over the same period.

The District Attorney argued that jury deliberations did not constitute good cause to permit discovery of disparities in charging data; the evidence of robbery and the jury's verdict on the robbery charge showed that the District Attorney acted appropriately in charging Chavers with robbery; Chavers's generalized statistics about incarceration rates were insufficient; and Chavers's discovery requests were burdensome, overbroad, unlikely to reveal similarly-situated individuals and sought confidential and privileged information. The District Attorney provided statistics from a data set (not including the Rialto Police Department) showing that the San Bernardino County Sheriff's office did not disproportionately conduct searches or use force against Black individuals versus White individuals.

At the hearing on Chaver's discovery motion, the trial court ruled that conduct during jury deliberations, jury selection, and by the Rialto Police Department did not supply a basis for Chavers's discovery request under Penal Code section 745, subdivision (d). It found that the District Attorney's charging decisions were the only basis that would support discovery; that is, whether the District Attorney charged Chavers with robbery because of

---

[20] The parties used both "African-American" and "Black" in the discovery pleadings and we replicate those references herein.

Chavers's race, or added a robbery charge to what was otherwise just an assault case because of Chavers's race.

The court focused on the burden to the District Attorney's office of locating similarly situated cases, which the court believed would require review of "every police report on every" assault, battery, criminal threats, and theft-related case "to see if there was an *Estes* robbery[21] that could have been charged as a 211 but wasn't." The court also ruled that the motion was untimely, reasoning that if Chavers wanted to challenge the charging decision, he should have done so when the charges were filed and not a year after the verdict.

The court found that Chavers's reliance on statistics and his race was inadequate to establish a plausible factual foundation without specific facts, and the specific facts of the offense that emerged at trial led the court to conclude that "the law allows the People to add a [robbery charge] with those basic facts."

In addition to his discovery motion, Chavez moved for a RJA hearing and remedy based on "bias by the Rialto Police Department, the San Bernardino District Attorney's Office, and seated jurors who deliberated on his case." He adopted his arguments and factual assertions from his discovery motion and also supplied statistics showing a disparate arrest rate for Blacks in Rialto compared to their representation in the population. In opposition, the District Attorney argued that Chavers had alleged no individualized facts demonstrating racial bias and thus failed to make a prima facie case. The District Attorney countered Chavers's factual

---

21    *People v. Estes* (1983) 147 Cal.App.3d 23, 27-28 recognized a theory of robbery where a defendant uses force or fear to retain stolen property initially taken without force or fear.

assertions, contending: the interviews with jurors about their deliberations did not show any juror had exhibited bias, there was no evidence the Rialto police credited the statements of the victims over those of Chavers claiming self-defense, the evidence supported the robbery charges, a conflict attorney determined there was no Fifth Amendment issue with respect to any of the witnesses, and the prosecutor proffered race-neutral reasons for her peremptory challenge of the juror.

At the motion hearing the court found Chavers had failed to make a prima facie case as to conduct by the Rialto police department or the District Attorney.  As to the police conduct, the court reasoned:

"The Rialto Police Department or any police department is not going to arrest the person who got punched in the face, is lying face down on the ground, has serious facial injuries, and is in the hospital.  They're not going to arrest that person.  They're going to arrest the person that threw the punch.  They're just not going to go beyond that on their level.

"And I should also note too because I know when it comes to the District Attorney's Office . . . about why this was filed as a robbery, I checked the court's records.  I'll take judicial notice of those, of course.  The Rialto Police Department arrested Mr. Chavers for [battery].  They did not arrest him for a [robbery], so I don't see a prima facie showing existing for anything that the Rialto Police Department did."

As it did in denying the discovery motion, the court rejected a RJA claim against the District Attorney because "there is a case, . . . *Estes*, [*supra*,] 147 Cal.App.3d 23, that does allow a filing for robbery in these type of cases, the situation that we had in this case."

41

The court found Chavers had made a prima facie case based on statements from a juror that "another juror who was Black was stuck on a racial issue for making comments revolving around [the] defendant's race . . . ." The court ordered an evidentiary hearing on the statements regarding that juror.

At the evidentiary hearing, the defense proffered interview reports from investigators who had spoken with several jurors, a signed statement by a juror, a law review article about race and self-defense, and media articles about shootings of unarmed Black teenagers by White men. The court declined to admit the articles into evidence but accepted the other exhibits.

The court found that according to one of the jurors, "an African-American juror thought that because . . . Chavers was Black, he had reasons for doing what he did, for not calling the police." The court inferred that the comment pertained to a claim of self-defense by Chavers, which was available as a defense to the assault charge but not the robbery charge. Because the jury did not convict of assault—implying the African-American juror maintained her views and had not voted to convict—the court concluded that Penal Code section 745, subdivision (a), which provides that "the state shall not . . . obtain a criminal conviction . . . on the basis of race," had not been violated.[22]

D. *Analysis*

We conclude that the trial court erroneously applied the law in two respects in denying Chavers's motion for discovery. First, it limited its consideration only to a claim of disparity in the District Attorney's charging decision under Penal Code section 745, subdivision (a)(3), instead of

---

[22] Chavers does not challenge the denial of his RJA motion on appeal.

considering whether the discovery might relate to any possible violation of subdivision (a). Second, the court focused on whether case-specific facts were legally sufficient to establish a violation of Penal Code section 211, not whether the facts could support a potential violation of the RJA.

The trial court found that the allegation of charging disparity as described in Penal Code section 745, subdivision (a)(3), supplied the only basis for Chavers's motion for discovery. This was incorrect. The court should not have narrowed Chavers's claim, and should have considered whether the requested discovery could have led to relevant evidence of a potential violation of any of the provisions of Penal Code 745, subdivision (a), including whether a law enforcement officer involved in the case exhibited bias or animus toward the defendant because of his race, or whether during trial the prosecutor or a juror exhibited bias or animus towards the defendant because of his race, in addition to whether he was charged of a more serious offense because of his race. (Pen. Code § 745, subds. (a)(1), (2), (3).) (*Gonzales, supra*, 108 Cal.App.5th at Supp. p. 60 [a defendant moving for disclosure need not isolate the asserted basis for the potential violation under Penal Code section 745, subdivision (a) to show a plausible factual foundation].)

Second, the court's focus on whether the evidence satisfied the elements of robbery was misguided. The material question is not whether sufficient evidence supported the crime, but whether the case-specific facts established a plausible factual foundation that a violation of the RJA "could or might have occurred." (*Young, supra,* 79 Cal.App.5th at p. 159; see *McDaniel*, supra, 111 Cal.App.5th at p. 244 [trial court should consider the "relevance of the proffered facts to the claims of racial bias"]). We assume the District

43

Attorney had an evidentiary basis to charge Chavers with robbery[23]; the operative question is whether Chavers's race directly or unconsciously affected the District Attorney's exercise of discretion to file that charge against Chavers. Put another way, would the District Attorney have chosen not to charge a similarly-situated defendant of a different race with robbery based on similar evidence, a question the data Chavers sought in his discovery motion would help to illuminate.

We recognize that the RJA "is a fairly new piece of legislation and cases interpreting it typically require courts to grapple with novel issues of law as they consider how best to implement the act." (See *Jackson v. Superior Court, supra,* 109 Cal.App.5th at p. 382.) But while the RJA is new, the jurisprudence that inspired it is longstanding. That the Constitution requires scrutiny of the fairness of the proceeding and not merely the guilt of

---

[23] Certainly, a showing that the District Attorney brought the robbery charge in the *absence* of admissible evidence could suggest implicit bias and potentially support a finding of a violation of Penal Code section 745, subdivision (a).

the defendant is evident across our selective prosecution and equal protection case law.[24]

Indeed, Chavers may have been able to make his case even without case-specific facts—sidestepping the question of the strength of the evidence adduced at trial, upon which the trial court relied. We acknowledge the trial court lacked the benefit of the decisions in *Gonzales* and *McDaniel*, decided after the trial court's ruling, which explained that county-specific statistical data may suffice to establish a plausible foundation of a violation of the

---

[24] In *McCleskey v. Kemp* (1987) 481 U.S. 279, 292, for example, the Supreme Court accepted findings showing defendants in Georgia who killed White victims were 4.3 times more likely to receive the death penalty than defendants charged with killing Blacks. The question in *McCleskey* was not whether the prosecutor had sufficient evidence to seek the death penalty against the defendant, but whether racial bias influenced his decision to do so, and whether such bias violated the Constitution. According to the author of the bill, the RJA " 'is a countermeasure to a widely condemned 1987 legal precedent established in the case of *McCleskey v. Kemp*[, which] established an unreasonably high standard for victims of racism in the criminal legal system that is almost impossible to meet without direct proof that the racially discriminatory behavior was conscious, deliberate and targeted.' " (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2542 (2019–2020 Reg. Sess.) as amended Aug. 1, 2020, p. 7, italics added.)

Another seminal case which our courts have found analogous to the selective prosecution concern that drove enactment of the RJA concerned Chinese nationals who were fined and jailed for operating laundries without a permit. (*Young, supra*, 79 Cal.App.5th at pp. 164-165, citing *Yick Wo v. Hopkins* (1886) 118 US 356 (*Yick Wo*).) The focus in *Yick Wo* was not whether the evidence showed the Chinese nationals were illegally operating laundries—they were, since they did not have permits—but whether the universal denial of permits to Chinese nations violated the Equal Protection clause. (*Yick Wo*, 118 US at pp. 373-374).

45

RJA.[25]  (*McDaniel, supra*, 111 Cal.App.5th at pp. 248–249; *Gonzales, supra*, 108 Cal.App.5th at p. Supp. 66.)

For these reasons, we conclude that the trial court erred in denying Chavers's discovery motion.  We need not determine whether the trial court's error was prejudicial given our reversal and remand for a new trial as outlined above.  During subsequent proceedings, if Chavers again moves for discovery under the RJA, the trial court shall consider whether the requested

[25]  We express no opinion on whether the specific statistics Chavers proffered would establish a plausible foundation in his case.  The statistics in RJA discovery cases have primarily reflected racial disparities in the rates of policing activity or convictions.  (*See Young, supra*, 79 Cal.App.5th at p. 143 [statistics showed Blacks were more likely to be searched during traffic stops than non-Blacks]; *Jackson, supra,* 109 Cal.App.5th at pp. 377-378 [data compared traffic stops, searches, and use of force on Black and Latino residents versus White residents]; *McDaniel, supra*, 111 Cal.App. 5th at pp. 244-246 [data showed disparities in arrests, convictions, *and* incarceration]*; Gonzales, supra*, 108 Cal.App.5th at pp. Supp. 63-64 [data showed overrepresentation of Latinx individuals in arrests and charges].)

The *Young* court reasoned that evidence of bias in arrests could affect the pool of suspects presented to the prosecutor for charging decisions, and therefore may taint the charging process.  (*Young, supra*, 79 Cal.App.5th at p. 164.)  We have no difficulty seeing the logic of this "downstream" effect from racial bias in an earlier stage of the proceedings.

But Chavers supplied data showing racial disparity in incarceration rates.  We have yet to find a case which validates "upstream" inferences— that is, concluding that disparity in the population of incarcerated inmates alone suggests anything about racial bias in earlier stages of the proceeding, such as the sentencing of those inmates, their conviction by a jury (or the plea bargains offered), the relevant charging decisions or arrests.  We leave to the trial court in the first instance to determine whether Chavers has laid out a plausible foundation for a potential violation.  (*Cf. People v. Superior Court* (2025)*,* 114 Cal.App.5th 707 [state and federal statistics purportedly showing higher rates of incarceration for persons who shared defendant's ethnicity did not present the required plausible factual foundation to warrant discovery under RJA, nor did another case involving a White male charged with the same crime.].)

discovery might relate to any possible violation of Penal Code section 745, subdivision (a), and whether Chavers advanced a plausible factual foundation based on specific facts that a violation of the RJA could or might have occurred.

## DISPOSITION

The judgment is reversed and the case is remanded for a new trial, with the directions specified herein on the issue of RJA discovery.

O'ROURKE, Acting P. J.

WE CONCUR:

BUCHANAN, J.

KELETY, J.